UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | ) | Civil Action No.: 7:15-CV-3212-BHH |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| DAVID INGRAHAM, MICHAEL | ) | |
| INGRAHAM, and SUSAN INGRAHAM, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on Plaintiff Allstate Insurance Company's ("Plaintiff" or "Allstate") motion for summary judgment (ECF No. 24), Defendants David Ingraham, Michael Ingraham, and Susan Ingraham's (collectively "Defendants") motion for partial summary judgment (ECF No. 25), and Defendants' motion to compel (ECF No. 28). For the reasons set forth in this Order, Plaintiff's motion for summary judgment is denied, Defendants' motion for partial summary judgment is granted, and Defendants' motion to compel denied, without prejudice and with leave to refile.

## BACKGROUND

This is an insurance coverage action brought pursuant to the provisions of the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Federal Rule of Civil Procedure 57 to determine whether Allstate has a duty to defend or indemnify Defendants for all claims related to and arising out of the actions alleged in the underlying lawsuit styled *Anthony Marcantonio v. Kyle Dudzinkski, Luke Papendick, Charles Rommel, David Ingraham, and Jacob Pearce*, Case No. 3:15-cv-00029-NKM, in the United States District Court for the Western District of Virginia ("Underlying

Lawsuit"). The Underlying Lawsuit is now closed, the parties thereto having reached a confidential settlement agreement on March 28, 2016. *See Marcantonio v. Dudzinkski, et al.*, C/A No. 3:15-cv-00029-NKM (W.D. Va. May 13, 2016). Allstate seeks a declaration from the Court that an insurance policy issued by Allstate to Defendants Michael Ingraham and Susan Ingraham (the "Policy") provides no coverage for claims asserted against them in the Underlying Lawsuit, and that the Policy provides no coverage for Defendant David Ingraham (hereinafter "Ingraham") in connection with the Underlying Lawsuit.

In the Underlying Lawsuit, Anthony Marcantonio ("Marcantonio"), a freshman swimmer recruited by the University of Virginia Swim Team due to his athletic promise, sought damages against five upperclassmen swimmers (collectively "Underlying Defendants"), including Ingraham, for their respective roles in an alleged hazing incident during the Swim Team's "Welcome Week." (*See* Underlying Complaint, ECF No. 7-1.) All of the allegations in the Underlying Lawsuit related to the alleged hazing of Marcantonio by Ingraham and other upperclassmen members of the men's Swim Team. (*Id.*) In his complaint, Marcantonio brought nine causes of action related to the alleged hazing and one specific remedy request, namely: (1) Assault; (2) Battery; (3) False Imprisonment; (4) Hazing in Violation of Virginia Civil Law; (5) Tortious Interference with Contractual Relations; (6) Intentional Infliction of Emotional Distress; (7) Punitive Damages; (8) Conspiracy in Violation of Virginia Common Law; (9) Conspiracy in Violation of Virginia Code Sections 18.2-499 and 18.2-500; and (10) Negligence. (*Id.* at 23-28.) Defendant David Ingraham is the son of Defendants Michael Ingraham and Susan Ingraham, the named insureds on the Policy at issue in the case *sub judice*.

The Underlying Complaint alleged a wide range of conduct by upperclassmen swimmers, including Ingraham, against Marcantonio and other "first year"[1] swimmers, and asserted that the conduct amounted to hazing, various intentional torts, and negligence. (*See generally id.*) The actions complained of are largely contained in paragraph 26 of the Underlying Complaint, describing a series of events at a near-campus residence generally referred to as the "Swim House," and including but not limited to: (1) blaring "heavy-metal, satanic" music on a "television-sized speaker" so loudly that Marcantonio could hardly hear, with no conventional lighting on, and a strobe light as the only light source; (2) screaming and yelling obscenities and other vulgar speech at the first years throughout the events of the evening, sometimes with a threatening or aggressive tone; (3) instructing the first years to say derogatory and offensive words; (4) placing buckets on the first years' heads; (5) insulting and taunting the first years; (6) physically placing the first years in a line while the Underlying Defendants continued to taunt them; (7) "waltzing" in front of the first years and making threatening movements and grunts toward them; (8) blindfolding the first years with dirty, stained ties and cummerbunds; (9) forcing the first years to walk in a humiliating position while performing the "Elephant Walk," which involved them reaching between their legs, grabbing the private parts of the person behind them, and moving as a group; (10) forcing the first years to drink large quantities of liquids, including alcohol, while being closed in a dark, heated bathroom for an hour, with the threat of being sodomized if they did not comply, ultimately resulting in Marcantonio vomiting when he was forced to drink a large quantity of milk and prune juice; (11) injuring the eye of one first year when defendant Charles Rommel flew into a rage and smashed a glass bottle on the

---

[1] "First year" is a term used at the University of Virginia to refer to freshman students generally.

ground, causing a glass splinter to enter the first year's eyeball; (12) instructing the first years to imitate and mock one female Swim Team member who experiences episodes of hiccupping in a unique manner causing a distinctive sound; (13) instructing the first years to answer an intrusive and vulgar questionnaire, and directing each first year in turn to answer humiliating and degrading follow-up questions; (14) bringing each first year out of the bathroom where they were contained, one at a time, to be further humiliated in front of the group of upperclassmen; (15) pouring an unknown liquid on Marcantonio's head while he was being thus humiliated, forced to sit in a chair, and questioned in front of the group, blindfolded; (16) forcing the first years to maintain a "streamline" swim position with their "arms over their heads, shoulders squeezed toward the ears, and hands clasped together;" (17) forcing the first years to name and then eat a live goldfish provided to each of them by the upperclassmen; (18) instructing the first years to complete a scavenger list by a date certain, which would require stealing items from retail stores, the school, or other members of the Swim Team in violation of the University of Virginia's Honor Code; and (19) requiring the first years to wear "filthy ties and cummerbunds" around campus for the remainder of Welcome Week. (*Id.* ¶ 26.)

In summarizing these alleged actions, the Underlying Complaint stated, "[Marcantonio] and the other first years on the swim team had been thus tormented, harassed, assaulted, held captive, threatened and terrorized for over five hours. During the entire time [Marcantonio] had been subjected to the hazing described above, he had felt captive and not free to leave [the Swim House]." (*Id.* ¶ 27.) Furthermore, Marcantonio alleged that Ingraham and the other Underlying Defendants, in retaliation for Marcantonio honestly answering questions about the alleged hazing incident to the

head swim coach and the University of Virginia Dean of Students, ostracized and threatened him to the point where the swim coach instructed him not to practice in the pool when the other swimmers were present out of concern for his physical safety. (*Id.* ¶¶ 36-37.) Ultimately, Marcantonio could no longer swim for the University of Virginia effectively and left the school. (*Id.* ¶¶ 38-40.)

The "threat of sodomy" referenced above, stemmed from statements made in a vulgar email sent to the first year swimmers from the pseudonym "Mr. Mean," allegedly drafted in concert by the Underlying Defendants. The email instructed the first years where and when to show up for the first event of Welcome Week, which turned out to be the alleged hazing incident at the Swim House. (*Id.* ¶ 24.) The threat would supposedly be realized if any of the first years disclosed the details about the time and location of the first event, and the first years were instructed to "keep [their] FUCKING MOUTHS SHUT." (*Id.*) This threat of sodomy was allegedly repeated verbally while the first-year swimmers were contained in the bathroom and being yelled at to drink all the alcohol and other liquids provided. (*Id.* ¶ 26(xviii).) At that point, the threat would supposedly be realized for each of the first years "if any drop of alcohol was poured out the window or down the drain," which had been duct-taped closed along with the toilet, and the shower clogged.[2] (*Id.*)

As part of the settlement of the Underlying Lawsuit, the parties agreed to the issuance of a public statement in which it was acknowledged that Marcantonio had withdrawn certain allegations from the Underlying Complaint, namely: (1) that he was forced to drink alcohol; (2) that he was subjected to sexual assault or sexual battery

---

[2] Unspecified "[d]efendants" are alleged to have said that if any drop of alcohol was poured out, each of the first years would "get the dry-ice dildo," which, in turn, was a reference to one of the Mr. Mean's emails introducing this bizarre "threat." (ECF No. 7-1 at 12.)

(regarding the so-called "Elephant Walk"); (3) that the door on the bathroom where he and other first years were contained during a portion of the alleged hazing incident was locked (though it was simultaneously acknowledged that, under the circumstances, Marcantonio did not believe he was free to leave); (4) that Charles Rommel asked Marcantonio a question which prompted him to respond with a racial epithet; and (5) that any items were stolen during the scavenger hunt that was part of the alleged hazing incident. (ECF No. 36-2.) Marcantonio stood by the remaining allegations in the Underlying Complaint; the Underlying Defendants correspondingly denied those allegations. (*Id.*)

In their joint statement, the Underlying Defendants asserted their own position regarding the alleged conduct in question and the surrounding circumstances, including: (1) that before Welcome Week began, the team captains (Dudzinski and Papendick) told the first year swimmers about it and assured them that the upcoming activities were voluntary in terms of whether they drank alcohol or ate the goldfish; (2) that the captains invited the first years to come to them if they had any concerns (a contention that Marcantonio denied); (3) that none of the first years were asked to grab the genitals of any member of the team, and none of them did; (4) that University of Virginia investigators interviewed numerous people, including Marcantonio and four of the Underlying Defendants (Dudzinski, Papendick, Rommel, and Ingraham), and the investigators' final report stated that the Underlying Defendants interviewed had been "honest and cooperative"; and (5) subsequent to its own investigation, and prior to Marcantonio filing the Underlying Complaint, the University of Virginia Judiciary Committee ("UJC") conducted a hearing on the issue of whether Dudzinski had violated

the University's Standards of Conduct against hazing (Standard 6) and against intentionally or recklessly threatening the health or safety of another (Standard 2),[3] and based on that March 23, 2015 hearing the UJC found that Dudzinski was not guilty of either alleged violation. (ECF No. 36-2 at 3.)

Prior to the settlement of the Underlying Lawsuit, Ingraham defended the action and opposed any characterization of the events during Welcome Week as "hazing" or as stemming from intent to harm Marcantonio or anyone else. In his answer to the Underlying Complaint ("Underlying Answer"), Ingraham asserted a very different picture of the facts related to the alleged hazing incident. The Underlying Answer stated, *inter alia*: (1) the Welcome Week events were a tradition of the men's Swim Team that had been mimicked in the three years prior to Marcantonio's matriculation at University of Virginia, and its components did not materially change over the course of those years; (2) the purpose of Welcome Week was to enhance the competitiveness of the team and build team unity and spirit; (3) Marcantonio and the other first year swimmers were informed in advance that no one would be required to consume alcohol, and when Marcantonio indicated he did not drink alcohol he was told that his preference would be respected; (4) Marcantonio was specifically told that he could choose not to participate in any or all of the Welcome Week events, and he elected to participate; (5) Ingraham did not draft the "Mr. Mean" emails (including the email containing the threat of sodomy with a "dry-ice dildo"); (6) although derogatory, the Mr. Mean emails were intended to convey frivolity and jocularity and to be so cartoonish as not to be taken literally; (7) the Elephant Walk involved grabbing the wrist of the person behind you, not genitalia as

---

[3] The Underlying Complaint stated that defendant Kyle Dudzinski, one of two team captains, was the "ringleader" during the entire incident, initiating many of the alleged hazing actions and being followed by the other Underlying Defendants and upperclassmen swimmers present. (ECF No. 7-1 at 20.)

originally alleged by Marcantonio and later withdrawn; (8) Marcantonio voluntarily consumed milk and prune juice, not alcohol; (9) the vulgar questionnaires the first years were instructed to complete were designed to be "over the top" and were intended to invite fictional responses; (10) the bathroom was not locked, and anyone could leave at any time; (11) the upperclassmen and first years were laughing with one another throughout the individual questioning, which employed the same exaggerated tone as the emails; (12) the individual questioning of Marcantonio also included laughter and joking; (13) everyone present, including Marcantonio, capped the opening night event with toasting; (14) Marcantonio's toast included an expression of his pride in being a part of the team and his excitement over the upcoming season; (15) Marcantonio volunteered to be responsible for holding and maintaining the single list of items to be gathered during the scavenger hunt; (16) Marcantonio voluntarily swallowed a minnow, and the one first year who objected for religious reasons was not required to do so, and was not subject to criticism or consequence for that decision; (17) after the events of the alleged hazing incident, Marcantonio joined the other first years and upperclassmen at a pizza restaurant; (18) Marcantonio participated in the scavenger hunt over the next week, which did not involve stealing (an allegation that Marcantonio specifically withdrew as part of the settlement agreement); (19) Marcantonio voluntarily participated in all activities, at all times manifested assent, never objected, complained, withdrew, or expressed any reluctance, and was not coerced or threatened; (20) while the events of the evening at the Swim House included a lot of yelling, screaming, and obscenities, the tone of those events was one of jest, joking, and frivolity, not taunting; (21) Ingraham denied that he came menacingly close to Marcantonio with sudden or threatening

movements; (22) Ingraham denied that Marcantonio ever appeared to be delirious, fearful, or paralyzed (as alleged in the Underlying Complaint) or that Marcantonio was pushed into his seat during individual questioning in front of the group; (23) Ingraham denied that Marcantonio, or any first year, was subjected to hazing or "forced" to do any particular act on the evening in question; (24) Ingraham denied that he threatened Marcantonio or instructed him to make false statements if asked about the eye injury to one of the first years during the alleged hazing incident; (25) Ingraham denied that the scavenger hunt would require violation of the University Honor Code or any laws of the Commonwealth of Virginia, including stealing. (*See* ECF No. 36-1.)

On December 17, 2015, following a hearing on the Underlying Defendants' motions to dismiss, the trial court dismissed Marcantonio's causes of action for tortious interference with contractual relations, intentional infliction of emotional distress, and statutory conspiracy for failure to state a claim. (ECF No. 25-1 at 19-23, 25-29.) Additionally, the trial court identified three areas of concern with respect to Marcantonio's overall pleading scheme, which "whether strategically or out of necessity—contains many vague or ambiguous allegations": (1) the Underlying Complaint often lumps together all "[d]efendants" without regard for which defendant actually did what; (2) the Underlying Complaint uses passive voice and omits the identity of the actor (e.g. "the first years were forced to remain in the darkened bathroom"; Marcantonio "was again forced to sit in a chair"; "all the first years were . . . made to assume a . . . 'streamline' position"; etc.); (3) some allegations assert that "upperclassmen" took certain actions (e.g. telling Marcantonio to sit down and ordering him to memorize vulgar trivia answers), an ambiguous term that could encompass the

Underlying Defendants, non-defendant upperclassmen present at the event, or a mix of the two groups. (*Id.* at 11-12.) Despite these apparent pleading deficiencies, the trial court found that, with the exception of Defendant Papendick, the Underlying Complaint supplemented its generic or ambiguous references with several specific allegations against the Underlying Defendants by name. (*Id.* at 12.) With respect to the negligence cause of action, the trial court stated simply, "[T]he Complaint contains ample facts to state a negligence claim." (*Id.* at 29.)

Allstate issued Deluxe Homeowners Insurance Policy No. 0 55 209571 09/15 to Defendants Michael and Susan Ingraham for the September 15, 2013 to September 15, 2014 policy period. (ECF No. 7-2 at 4.) The Policy provides the following definitions for terms used throughout the Policy:

> ***Definitions Used In This Policy***
>
> 1. "**You**" or "**your**"—means the person named on the Policy Declarations as the insured and that person's resident spouse.
>
>         \* \* \* \*
>
> 2. "**Insured person(s)**"—means **you** and, if a resident of **your** household:
>    a)  any relative; and
>    b)  any dependent person in **your** care.
>
>         \* \* \* \*
>
> 9. "**Occurrence**"—means an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in **bodily injury** or **property damage**.

(ECF No. 7-2 at 22-23 (emphasis in original).)

The Policy contains "Coverage X Family Liability Protection." (*Id.* at 39-41.) The Coverage X provision states, *inter alia*:

> Subject to the terms, conditions and limitations of this policy, **Allstate** will pay damages which an **insured person** becomes legally obligated to pay

because of **bodily injury** or **property damage** arising from an **occurrence** to which this policy applies, and is covered by this part of the policy.

**We** may investigate or settle any claim or suit for covered damages against an **insured person**. If an **insured person** is sued for these damages, **we** will provide a defense with counsel of **our** choice, even if the allegations are groundless, false or fraudulent. **We** are not obligated to pay any claim or judgment after **we** have exhausted **our** limit of liability.

(*Id.* at 39 (emphasis in original).) The Coverage X provision also contains certain exclusions, including:

1. **We** do not cover any **bodily injury** or **property damage** intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any **insured person**. This exclusion applies even if:

   a) such **insured person** lacks the mental capacity to govern his or her conduct;
   b) such **bodily injury** or **property damage** is of a different kind or degree than intended or reasonably expected; or
   c) such **bodily injury** or **property damage** is sustained by a different person than intended or reasonably expected.

   This exclusion applies regardless of whether or not such **insured person** is actually charged with, or convicted of a crime.

(*Id.* (emphasis in original).)

## LEGAL STANDARD

**Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a

movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the Court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Where, as here, the Court is presented with the question of whether an insurance policy covers a particular claim, summary judgment is the proper mechanism by which to determine whether coverage is available. *See OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, 242 Fed. App'x 936, 939 (4th Cir. 2007) ("Because the facts are undisputed and we are presented with a purely legal question of insurance coverage, the case is ripe for summary judgment.").

**South Carolina Insurance Law**

"[U]nder South Carolina law, '[q]uestions of coverage and the duty of a liability insurance company to defend a claim brought against its insured are determined by the allegations of the [underlying] complaint.'" *Auto Owners Ins. Co. v. Pers. Touch Med Spa*, LLC, 763 F. Supp. 2d 769, 776 (D.S.C. 2011) (quoting *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574, 578 (S.C. 2009)). In South Carolina, the duty to defend is broader than the duty to indemnify. *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 809 F. Supp. 2d 449, 457 (D.S.C. 2011). "If the underlying complaint creates a *possibility* of coverage under an insurance policy, the insurer is obligated to defend." *City of Hartsville*, 677 S.E.2d at 578 (citing *Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co*, 265 S.E.2d 38 (S.C. 1980)) (emphasis added).

This District has previously explained, "[T]he duty to defend is triggered where the underlying complaint includes *any allegation* that raises the possibility of coverage." *Auto-Owners Ins. Co. v. Newsome*, No. 4:12-CV-00447-RBH, 2013 WL 3148334, at *4 (D.S.C. June 19, 2013) (emphasis added). Critically, an insurer whose duty to defend has been triggered by a lawsuit against the insured "is not justified in refusing to defend the entire case." *Town of Duncan v. State Budget & Control Bd.*, 482 S.E.2d 768, 773-74 (S.C. 1997); *see also Employers Mut. Liab. Ins. Co. v. Hendrix*, 199 F.2d 53, 59 (4th Cir. 1952) (stating with regard to a South Carolina insurance action, "[a]n insurer is not excused from defending suits against the policy holder by the joinder in the same suits of causes of action covered by the policy with the other causes of action beyond its scope"); *Cincinnati Ins. Co. v. Crossmann Cmtys. of N.C., Inc.*, No. 4:09-CV-1379-RBH, 2013 WL 1282017, at *11 (D.S.C. Mar. 27, 2013) ("South Carolina law requires that a

triggered insurer with a duty to defend the policyholder in a suit must defend the policyholder against all claims in that suit, even those claims that are not covered under the policy."). "In short, if there is even one aspect of the claim which must be defended, the insurer must defend the entire suit." *Berenyi, Inc. v. Landmark Am. Ins. Co.*, No. C.A. 2:09-CV01556PMD, 2010 WL 233861, at *4 (D.S.C. Jan. 14, 2010) (citing *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318, 319 (S.C. Ct. App. 1994)). "[C]lauses of inclusion should be broadly construed in favor of coverage, and when there are doubts about the existence or extent of coverage, the language of the policy is to be 'understood in its most inclusive sense.'" *Cook v. State Farm Auto. Ins. Co.*, 656 S.E.2d 784, 786 (S.C. Ct. App. 2008) (quoting *Buddin v. Nationwide Mut. Ins. Co.*, 157 S.E.2d 633, 635 (1967)). "Courts should not, however, 'torture the meaning of policy language in order to extend' or defeat coverage that was 'never intended by the parties.'" *Cook*, 656 S.E.2d at 786-87 (quoting *Torrington Co. v. Aetna Cas. & Sur. Co.*, 216 S.E.2d 547, 550 (S.C. 1975)).

The possibility of coverage triggering an insurer's duty to defend may also be determined by facts outside of the complaint that are known by the insurer. *City of Hartsville*, 677 S.E.2d 574, 578 (S.C. 2009) (citing *USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 798 (S.C. 2008)). In addition, the Supreme Court of South Carolina has indicated that orders issued by the underlying trial court may be considered when determining whether the underlying claims create a possibility of coverage under an insurer's liability policy. In *City of Hartsville*, the underlying trial court's orders recognized a cause of action that created a possibility of coverage, and authorized the claimant's pursuit of that claim, even though the claimant had failed to

specifically plead the cause of action. 677 S.E.2d at 579. The *City of Hartsville* court held that the insurer had an ongoing duty to defend based upon that cause of action, despite the fact that it was not specifically pled, because the underlying trial court recognized the existence of the claim at a hearing on a motion for summary judgment. *Id.* at 576-77. The court stated, "[T]he allegations in the pleadings, the facts known to the insurer, and the [underlying trial] court's recognition of [the underlying plaintiff's] conspiracy claim, created a possibility of coverage under the Insurer's liability policy." *Id.* at 579.

## DISCUSSION

### I. Motions for Summary Judgment

The central dispute in this matter is whether the Policy provides coverage to Defendants in light of the allegations of the Underlying Lawsuit, the definition of an "occurrence" under the Policy, and the assertion that the alleged damages arose from intentional or criminal acts for which coverage is expressly excluded. Allstate contends it is entitled to summary judgment in its favor because no coverage exists as a matter of law. Defendants contend that they are entitled to partial summary judgment on the duty to defend because the Underlying Complaint stated a plausible claim for negligence, and that summary judgment should be denied to Allstate because the exclusions in the Coverage X provision of the Policy do not preclude coverage for Ingraham's alleged conduct.

Allstate argues: (1) the Underlying Complaint does not include allegations of an "occurrence" triggering coverage under the Policy because the allegations describe intentional conduct that does not fit under the Policy's definition of "occurrence" as "an

accident" (*see* ECF No. 24-1 at 12-14); (2) Marcantonio's "improper attempt" to characterize his hazing allegations as negligence did not create an "occurrence" covered by the Policy because his negligence cause of action simply incorporated the allegations underlying his causes of action for intentional torts (*see id.* at 14-18); (3) even if the allegations in the Underlying Lawsuit constitute an "occurrence," coverage would still be unavailable because Ingraham's alleged hazing of Marcantonio is an intentional act that is expressly excluded from coverage (*see id.* at 18-21); (4) coverage is also excluded under the policy because the Underlying Complaint alleges conduct by Ingraham that falls squarely within the scope of Virginia's anti-hazing statute, amounts to criminal behavior, and is expressly excluded from coverage (*see id.* at 21-22); (5) because coverage under the Policy is not triggered, there is no basis whereby Allstate is obligated to defend Ingraham in connection with the Underlying Lawsuit, and Allstate is therefore entitled to summary judgment and a declaration that the Policy does not provide coverage (*see id.* at 22-23).

In contrast, Defendants assert that they are entitled to partial summary judgment on their counterclaim against Allstate on the issue of Allstate's duty to defend Ingraham in the Underlying Lawsuit. (ECF No. 25 at 1.) Grounding their argument in applicable state law, Defendants assert that Allstate has a duty to defend its insured when, resolving any ambiguity in favor of the insured (*see Cook*, 656 S.E.2d at 786), there is any possibility (*see City of Hartsville*, 677 S.E.2d at 578), based upon the allegations of the Underlying Complaint, the facts known by Allstate, and the decisions of the trial court (*see id.* at 579), that the following three elements are met: (1) Allstate's insured (2) is sued for physical injury or property damage (3) arising from an accident. (ECF No. 25

at 5.) An "accident," in turn, is when an injury arises from either: (1) "'an unexpected happening or event, which occurs by chance and usually suddenly, with harmful result, not intended or designed by the person suffering the harm or hurt,'" *State Farm Fire & Cas. Co. v. Blanton*, No. 4:13-CV-2508-RBH, 2015 WL 9239788, at *8 (D.S.C. Dec. 17, 2015) (quoting *Walde v. Association Insurance Co.*, 737 S.E.2d 631, 638 (S.C. Ct. App. 2012) (defining accident from point of view of victim)); or (2) "'an effect which the actor did not intend to produce and cannot be charged with the design of producing.'" *Id.* (quoting *Goethe v. New York Life Ins Co.*, 190 S.E. 451 (S.C. 1937) (defining accident from point of view of actor)). (ECF No. 25 at 5.)

Defendants assert that all three of the elements necessary to trigger a duty to defend are met in that: (1) Ingraham is an insured under the Policy; (2) Marcantonio sued Ingraham because of bodily injury, specifically vomiting; and (3) based on the negligence claim in the Underlying Complaint, the facts known to Allstate (e.g. the trial court's December 17, 2015 order explained *supra* at 9-10), and the orders of the trial court (ruling, *inter alia*, that the Underlying Complaint contained ample facts to state a negligence claim), it follows that there is a possibility that the bodily injury in question arose from an accident. (*Id.* at 6-8.) Defendants further argue that they need only show that one cause of action in the Underlying Complaint alleges accidental damage, even if other causes of action allege intentional injury. (*Id.* at 7.)

Moreover, Defendants state that although the Underlying Complaint included allegations of intentional torts and hazing, the Underlying Answer cast a very different light on the events in question. They assert that the picture painted in the Underlying Answer "reveal[ed] the atmosphere of Welcome Week was not one of a sadistic mob

seeking to impose terror, fear, and physical harm; but instead was one of a group of college guys, including Marcantonio, engaging in juvenile antics, jocularity, and high jinks that seemed funny at the time." (ECF No. 36 at 4.) Although, the defendants to the Underlying Lawsuit ultimately acknowledged in their public statement that Welcome Week included "inappropriate words and actions" (*see* ECF No. 36-2 at 2), such an acknowledgement, argue Defendants, does not mean that those actions rose to the level of hazing or intent to cause injury. (ECF No. 36 at 4.) Rather, "To the extent there was any injury, one reasonable conclusion is that the injury was unexpected and accidental and a result of negligence as opposed to an intent to harm." (*Id.*)

**(a) The Nature of the Injuries Alleged, the Identity of the Actors Accused, and the Definition of "Accident"**

Plaintiff repeatedly and insistently characterizes the overarching nature of the Underlying Lawsuit as a series of claims arising from the Underlying Defendants' "intentional hazing" of Marcantonio. The Court will address below why this reading of the Underlying Complaint is overly simplistic. It is helpful at the outset, however, to understand what "hazing" means under the applicable state law, in order to better understand the nature of the injuries alleged by Marcantonio and how those injuries might relate to Ingraham's potential liability. All of the questions regarding whether there is a possibility of coverage under the Policy relate to the Policy's definition of an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in **bodily injury** or **property damage**." (*See* ECF No. 7-2 at 23 (emphasis in original).)

In Virginia, it is "unlawful to haze so as to cause bodily injury, any student at any school, college, or university." Va. Code § 18.2-56. Hazing is defined in the following

manner:

> to recklessly or intentionally endanger the health or safety of a student or students or to inflict bodily injury on a student or students in connection with or for the purpose of initiation, admission into or affiliation with or as a condition for continued membership in a club, organization, association, fraternity, sorority, or student body regardless of whether the student or students so endangered or injured participated voluntarily in the relevant activity.

*Id.* Hazing is categorized as a criminal misdemeanor; however, "[a]ny person *receiving bodily injury* by hazing shall have a right to sue civilly, the person or persons guilty thereof, whether adults or infants." *Id.* (emphasis added).

In the Underlying Lawsuit, the Underlying Defendants' sought dismissal of the hazing claim, arguing that Marcantonio did not suffer any "bodily injury." (*See* ECF No. 25-1 at 18.) The trial court helpfully parsed the applicable case law and determined that the Underlying Complaint included plausible allegations of bodily injury, specifically vomiting, because vomiting includes hurt to the human body. (*See id.* at 18-19 (citing *English v. Virginia*, 715 S.E.2d 391, 395 (Va. Ct. App. 2011)).) In so holding, the trial court rejected the Underlying Defendants' argument that vomiting after drinking copious amounts of milk and prune juice was merely a bodily "reaction" and not a bodily injury. (*Id.*)

The undersigned agrees with the trial court's analysis and finds that the Underlying Lawsuit includes an allegation of bodily injury, as manifested in Marcantonio's vomiting. It is important to note that if this injury had been substantiated at trial, it would not have required a jury to find that it was intentionally caused. Indeed, it is quite easy to envision a scenario in which the fact finder evaluated the conduct in question and determined that Marcantonio's injuries were an accidental result of

"intentional" (i.e. not involuntary) conduct.

Here, the Court must say a few words about the inherent vagueness in the pleading scheme of the Underlying Complaint. Though most of the alleged conduct detailed in the Underlying Complaint is ascribed to "the defendants," not all of the allegations could reasonably be attributed to all five of the upperclassmen swimmers named. For example, Dudzinski, Papendick, Rommel, Pearce, and Ingraham could not have *each* placed a bucket on *every* first year swimmer's head. (*See* ECF No. 7-1 ¶ 26(vii) (stating: "Defendants then proceeded to put buckets on plaintiff's and the other first years' heads.").) Such a scenario would nonsensically include each first year swimmer having the same bucket placed on his head five separate times. Presumably, to the extent buckets were placed on heads, each bucket was placed by a single Underlying Defendant, and we have no indication which head Ingraham covered with a bucket, if any. This is only one example of the latent imprecision in the pleading. As demonstrated here, the Underlying Complaint, in large part, fails to explain *which one(s)* of the Underlying Defendants did, or did not, do any particular thing. Indeed, aside from occasional references to the particular conduct of a specifically identified Underlying Defendant, the Underlying Complaint constitutes a hodgepodge of allegations asserted against the "[Underlying] Defendants" collectively, with Dudzinski being identified as the "ringleader" and main instigator. (ECF No. 7-1 ¶ 28.)

To be clear, this observation is by no means meant as a criticism of the pleading scheme in the Underlying Complaint—far from it. Assuming, for a moment, that the universe of Marcantonio's allegations were true (excluding those he specifically withdrew as part of the settlement agreement), it would be entirely understandable that

he might not be able to identify exactly which upperclassman swimmer did what and when, given that he was terrified, disoriented, and intermittently blindfolded. Nonetheless, it is eminently possible that a fact finder, based on evidence adduced at a trial, might have attributed only negligently imposed bodily injury to Ingraham, but intentionally imposed bodily injury to Dudzinski, or vice versa, *et sic porro*.

As previously noted, South Carolina courts have alternatively defined "accident" from the point of view of the victim and the point of view of the actor. *See, e.g.*, Blanton, 2015 WL 9239788, at *8. Any injuries suffered by Marcantonio during the events at the Swim House were certainly not the result of an intention or design on Marcantonio's part to hurt himself. Thus, one might say that an "accident" occurred when Marcantonio vomited unexpectedly and suddenly because he took one too many drinks of prune juice in combination with the gallon of milk he apparently drank in a rather limited period of time. *See Walde*, 737 S.E.2d at 638 (accident defined from the victim's point of view). But this first definition of "accident" does not seem particularly helpful in light of Marcantonio's allegations that he was coerced (whether by threats, peer pressure, or some unexplained physical coercion) to drink the liquids.

The second, more relevant, definition of "accident" in South Carolina law explains it as "'an effect which the actor did not intend to produce and cannot be charged with the design of producing.'" *Manufacturers & Merchants Mut. Ins. Co. v. Harvey*, 498 S.E.2d 222, 225 (S.C. Ct. App. 1998) (quoting *Goethe*, 190 S.E. at 458). "More plainly stated, an *intended injury* cannot be accidental." *Id.* (emphasis added). In seeking to establish that the Policy's "occurrence" requirement was not triggered, Plaintiff's arguments go one step beyond this definition of "accident," insisting that any injury that

results from *intended conduct* cannot constitute an "accident." This further step is a bridge too far. It fails to distinguish between an accidental action and an accidental result (or "effect"), and essentially assumes that where there is intentional—that is, volitional—conduct, any attendant effects must have also been intended. To be sure, the Underlying Complaint is replete with allegations of intentional conduct. But proper analysis must also consider whether the resultant *injury* is accidental.

In a recent unpublished opinion, the Fourth Circuit applied South Carolina law regarding the definition of "accident" and affirmed the district court's holding that a negligence cause of action alleged an "occurrence" within the meaning of the applicable insurance policy such that the insurer's duty to defend was triggered. *Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*, 602 F. App'x 115, 119-22 (4th Cir. 2015). In *JM Smith Corp.*, the insurer argued that because the complaint alleged willful and intentional misconduct on the part of the insured, it did not set forth an "occurrence," which the policy defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 117, 119. The Fourth Circuit noted that "accident" was not a defined term in the policy, but "has been well-defined in South Carolina law to mean "'[a]n effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and cannot be charged with the design of producing.'" *Id.* at 120 (quoting *State Farm Fire & Cas. Co. v. Barrett*, 530 S.E.2d 132, 137 (S.C. Ct. App. 2000)). The court concluded: "In other words, accidents require that either the act *or the injury resulting from the act* be unintentional." *Id.* (emphasis added). A fair reading of the Underlying Complaint reveals that at least one theory of liability contained therein asserts a claim of unintentional

injury, namely vomiting caused by the Underlying Defendants' negligence. And the Underlying Complaint includes no allegation that Ingraham, or any of the other Underlying Defendants, *intended* Marcantonio to suffer this particular injury. Even if the pleading had included such an allegation, it would not have precluded the negligence claim as an alternative theory of liability and source of possible coverage.

Certainly, Marcantonio pled various causes of action, the alleged injuries from which could not be construed as accidental, e.g. false imprisonment, civil conspiracy, assault and battery, and the like. But those causes of action are not mutually exclusive with the negligence cause of action, which, in plain terms, could have invoked liability for Ingraham for providing too much milk and prune juice to drink, resulting in vomiting. To view the Underlying Complaint otherwise is to artificially read the negligence claim out of the pleading. For the foregoing reasons, the Court finds that the negligence cause of action satisfies the "occurrence" requirement and invoked a *possibility* of coverage under the Policy.

### (b) The Negligence Claim's Incorporation of the Allegations that Precede It

In the Court's view, Plaintiff oversimplifies the Underlying Complaint when it argues, "The intentional hazing is the sole basis upon which Marcantonio bases his various causes of action seeking damages." (*See* ECF No. 24-1 at 14.) This reductionist reading has the effect of superimposing a colloquial or vernacular understanding of what a "hazing" incident looks like over the entirety of Marcantonio's allegations, and does not permit the type of nuanced analysis of the pleading that is necessary to determine whether it invokes a duty to defend under the applicable law.

Plaintiff repeatedly engages in this reductionist reading, unilaterally distilling the

Underlying Complaint into a sort of omnibus-claim for "intentional hazing." For example, when discussing the negligence cause of action, and asserting that it does not actually include a valid claim for negligent conduct, Plaintiff states in conclusory fashion: "When read in the light of the allegations incorporated into Count X [Negligence], it is clear that the manner in which Ingraham treated Marcantonio was to intentionally haze him." (*See id.* at 15.) And in another passage: "[T]he sole basis of the Underlying Lawsuit is that Ingraham hazed Marcantonio, which resulted in the complained of damages." (*Id.* at 18.) Thus, Plaintiff's reasoning goes: the negligence claim really is no negligence claim at all, because the gravamen of the Underlying Complaint is "intentional hazing."

Careful analysis of this reasoning reveals that it assumes its own conclusion, and turns out to be circular. It amounts to saying: "Because all of the allegations that precede the negligence claim amount to an intentional hazing claim, and because the negligence claim incorporates those prior allegations, the negligence claim is actually a disguised version of the intentional hazing claim." This syllogism assumes, of course, that *all* of the allegations which precede the negligence claim constitute some sort of macro "intentional hazing" claim, and *only* that "intentional hazing" claim. In reality, the negligence claim, as is the case in virtually every civil complaint filed in this Court, incorporates *the alleged facts* that come before it in the complaint, not a macro-distillation of the "true" claim lurking behind those facts. To assume that none of the myriad facts in the Underlying Complaint create the possibility of a successful negligence claim against Ingraham based on accidentally inflicted injuries is to engage in an overly simplistic reading of the pleading.

This is especially true where, as the trial court noted in its December 2015 order,

the alleged actions of the Underlying Defendants are rarely disaggregated or shown to have been committed by an identifiable individual, and where the allegations of "force" are almost always stated in passive voice. For instance, with respect to the vomiting injury specifically, paragraph 26(xliv) states:

> Plaintiff had earlier told the defendants that he did not drink alcohol. As retribution *he had been forced* to drink a gallon of milk and later, during the toasting, four glasses of prune juice. He therefore threw up while they were all on the back porch, over the back porch balcony, and while he was doing so, these defendants taunted him with long and loud taunts of "oooooh and aaaaah."

(ECF No. 7-1 at 17-18 (emphasis added).) Presumably, this reference to "forced" consumption of milk relies on the "threat of sodomy" with the "dry-ice dildo" that occurred while Marcantonio and the other first year swimmers were contained in the bathroom. But none of the allegations regarding the threat of sodomy identify an individual Underlying Defendant (much less Ingraham) as making such a threat, nor does the description of events that transpired while the first years were in the bathroom explain any putative modality of "force" other than yelling and screaming the instructions to drink the liquids, apparently interspersed with plenty of profanity and slamming the door. (*See id.* ¶¶ 26(xvi), (xvii), (xviii), (xx), (xxi), (xxiii), (xxiv).) There is even less explanation of how Marcantonio was "forced" to drink the prune juice, which did not occur until after the first years left the bathroom, all blindfolds were removed, the music was turned off, and the entire team was gathered in one room for toasts made by each individual in turn. (*See id.* ¶¶ 26(xxxix), (xl), (xli).) The only reference to conduct specifically committed by Ingraham while Marcantonio was contained in the bathroom was a series of three humiliating, sexually-explicit questions Ingraham asked of Marcantonio as a follow-up to his answers on the questionnaire. (*See id.* ¶ 26(xxviii).) In

this context, it is entirely possible that, to the extent a fact finder identified Ingraham as being personally responsible for Marcantonio's vomiting, Ingraham's liability would be based, for example, on breach of a duty he owed to Marcantonio as his invitee at the Swim House.[4]

In highlighting the fact that Marcantonio "reallege[d] each and every [preceding] allegation" into the negligence cause of action (*see* ECF No. 7-1 ¶ 71), Allstate argues that the Underlying Complaint cannot be read in any other manner than to constitute intentional or criminal modalities of injury. Through this overly-simplistic characterization of a routine pleading practice, Allstate entreats the Court to emphasize form over substance, a practice in which the Court declines to engage. It is enough to say that "realleg[ing]" the prior paragraphs of the Underlying Complaint by reference appears to be nothing more than a practical tool to avoid unnecessary repetition and unmanageable document length. To restate the obvious, the Court sees this pleading practice employed in virtually every case containing two or more causes of action.

Moreover, the trial court made short shrift of Underlying Defendant Rommel's motion to dismiss the negligence cause of action, stating, "the [Underlying] Complaint contains ample facts to state a negligence claim." (ECF No. 25-1 at 29.) "Thus," Defendants convincingly argue, "even if the negligence claim was inadequately pled (as contended by Allstate), the fact that the [trial] court recognized it as a viable cause of action means that it creates a possibility of coverage." (*See* ECF No. 36 at 14 (citing *City of Hartsville*, 677 S.E.2d at 576-77).) The Court agrees on both points.

---

[4] Marcantonio advanced this theory in his September 23, 2015 memorandum in opposition to the Underlying Defendants' motions to dismiss (ECF No. 25-4 at 21-22), and Allstate had knowledge of the theory at that time. Ultimately, as already noted, the trial court denied the motions to dismiss this claim and found that Marcantonio adequately pled a negligence claim.

The cases Plaintiff cites in support of its assertion that the negligence claim does not invoke a possibility of coverage are unavailing. In *State Farm Fire & Cas. Co. v. Barrett*, the South Carolina Court of Appeals stated: "Although South Carolina allows alternative pleading, a party may not invoke coverage by couching intentional acts in negligence terms." 530 S.E.2d at 137  (citing *Harvey*, 498 S.E.2d at 227). Accordingly, the *Barrett* court held that a plaintiff's use of the word "negligence" in her complaint neither extended coverage nor obligated the insurer to defend its insured. *Id.*

*Barrett* involved allegations of sexual misconduct and is inapplicable here. The South Carolina Court of Appeals held "that an intent to harm will be inferred as a matter of law when a person sexually assaults, harasses, or otherwise engages in sexual misconduct towards an adult." *Id.* at 136. Both the underlying plaintiff and underlying defendant in *Barrett* argued that the amended complaint contained causes of action sounding in negligence, invoking a possibility of coverage, but the actual claims in the amended complaint were limited to: (1) outrage/intentional infliction of emotional distress, (2) false imprisonment, (3) assault, (4) battery, and (5) invasion of privacy. *Id.* at 136-37. Thus, when the court held that the use of the word "negligence" did not invoke coverage, it was referring to the inclusion of that word *within the intentional tort claims, not to an independent negligence claim. Id.* In that context, the term "negligence" was surplusage, a situation readily distinguishable from the Underlying Complaint in the instant case, which includes an independent negligence claim. *See USAA Prop. & Cas. Ins. Co. v. Rowland*, 435 S.E.2d 879, 882 (S.C. Ct. App. 1993) ("[I]n the context of a cause of action alleging an intentional tort, which by definition cannot be committed in a negligent manner, the allegation of negligence is surplusage." (internal

citation and quotation marks omitted)).

In *MCE Auto., Inc. v. Nat'l Cas. Co.*, the underlying plaintiff's permanent guardian and conservator brought an action against an auto dealer alleging that the dealer took advantage of the plaintiff, a vulnerable adult, by selling her a large number of cars for herself and others. No. CA 6:11-1245-TMC, 2012 WL 4479163, at *1 (D.S.C. Sept. 28, 2012), *aff'd*, 535 F. App'x 303 (4th Cir. 2013). The underlying complaint asserted six causes of action against the auto dealer: (1) exploitation of a vulnerable adult, (2) civil conspiracy, (3) conversion, (4) illegal and unenforceable contract, (5) unfair trade practices, and (6) negligence. *Id.* In granting summary judgment to the insurer on the coverage issue, Judge Cain stated that "the court is to look beyond the label of negligence and determine if [the insurer] had a duty to defend." *Id.* at *4 (citing *Harvey*, 498 S.E.2d at 228 (holding that where a complaint mischaracterizes intentional conduct as negligent conduct, a court may find no duty to defend despite the label of negligence in the complaint)). Judge Cain evaluated the dealer's alleged conduct of selling thirteen cars to an 82-year old woman over the course of less than two years, and found that those factual allegations "constitute[d] intentional and deliberate acts *with an alleged purpose of preying upon a vulnerable adult* and they cannot be construed as accidental in nature." *Id.* (citing *Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 666 S.E.2d 897, 899-900 (S.C. 2008) (holding that factual allegations involving the sale, lease and distribution of gambling machines specifically configured in a manner designed to addict patrons to gambling constituted intentional, deliberate, and illegal acts executed with an unlawful purpose and could not be construed as accidental in nature so as to support a negligent misrepresentation claim and invoke coverage)) (emphasis added). However,

that finding is distinguishable from the factual allegations of the Underlying Complaint in the instant case, which, as already explained above, *can* be construed as accidental in nature.

Plaintiff also cites *Amica Mut. Ins. Co. v. Fischer*, No. CVF07-1410 OWW/DLB, 2008 WL 1970639, at *13-15 (E.D. Cal. May 5, 2008), for the proposition that, in a hazing and sexual abuse case, the conduct alleged by the underlying plaintiff cannot be construed as accidental or negligent. (*See* ECF No. 24-1 at 17-18.) However, a cursory review of the alleged facts in *Fischer* reveals that they are not even remotely similar to the alleged facts in the instant case. In *Fischer*, the underlying plaintiff alleged that, at a high school football camp, he was forcibly restrained and subjected to anal penetration with a foreign object, among other instances of bodily injury inflicted by physical striking. *See* 2008 WL 1970639 at *3, *7-8. Thus, it is little wonder that the court concluded no accidental or negligent injury could be extrapolated from the pleadings, stating, "There is no doubt that the present allegations of the underlying complaints compel the conclusion that Amica has no duty to defend." *Id.* at *13. The *Fischer* case is simply inapplicable to the case *sub judice*. The alleged facts are so dissimilar as to make comparison of the two cases a fruitless task. Suffice to say, *Fischer* offers no support for Plaintiffs arguments here.

In sum, based on our own review of the pleading scheme in the Underlying Complaint, as well as the trial court's recognition of a valid cause of action for negligence, this Court finds that Marcantonio's negligence claim was not simply a repetition of his intentional tort allegations cloaked in negligence terms. *See Blanton*, 2015 WL 9239788, at *11 ("[T]he state court judge in the underlying tort case found

sufficient evidence to charge the jury on negligence as well as self defense. Therefore, this court does not find that the acts by Blanton were intentional acts cloaked in negligence terms."). Moreover, the Court finds that the rule of inferred intent to injure, invoked in cases like *Harvey*, *Collins Holding Corp.*, and *MCE Auto.*,[5] is not invoked by the totality of the allegations in the Underlying Complaint, and the possibility of coverage is therefore not precluded.

### (c) The Applicability of the Intentional/Criminal-Acts Exclusion

Plaintiff argues that even if the allegations in the Underlying Lawsuit were to constitute an "occurrence" under the policy, coverage would still be unavailable because of the following exclusion contained in the Coverage X portion of the Policy: "**We** do not cover any **bodily injury** or **property damage** intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any **insured person**." (ECF No. 24-1 at 18-22.) The exclusion further states that it applies "even if . . . such **bodily injury** or **property damage** is of a different kind or degree than intended or reasonably expected." (ECF No. 7-2 at 39.) Plaintiff asserts that Ingraham's actions were intentional and/or criminal in nature, and therefore expressly excluded from coverage. (*Id.*)

The Court need not dwell long on this issue because Plaintiff's arguments here are premised on the assumption, debunked above, that the Underlying Complaint pleads a sort of macro-claim for "intentional hazing" *and only* intentional hazing. (*See,*

---

[5] Judge Harwell effectively described the rule of inferred intent by summarizing the holding in *Harvey* in the following manner: "That case held that the effect of sexual abuse is so integral to the act that the intent to do the act is interchangeable with the intent to cause the resulting injury. In other words, the act is so 'inherently injurious that it cannot be performed without causing the resulting injury.'" *Blanton*, 2015 WL 9239788 at *8 (quoting *Harvey*, 498 S.E.2d at 227 (quoting *Vermont Mutual Insurance Company v. Malcolm*, 517 A.2d 800, 802 (Vt. 1986))).

*e.g.*, ECF No. 24-1 at 18 ("Ingraham's acts were intentional in nature, and the policy expressly excludes coverage for such acts."), 19 ("[B]ecause Ingraham's hazing of Marcantonio was intended and the resulting damage was reasonably expected, coverage is not afforded under the policy for the Underlying Lawsuit."), 22 ("The allegations in the Underlying Lawsuit all involve intentional acts by Ingraham hazing Marcantonio.").) Indeed, Plaintiff's arguments on the intentional/criminal-acts exclusion are somewhat ironic given that, following the University of Virginia's investigation and adjudication of the matter, Dudzinski, the "ringleader" and main instigator of the putative "intentional hazing" in question, was found not guilty of violating the University's Standards of Conduct against hazing and intentionally or recklessly threatening the health or safety of another. (*See* ECF No. 36-2 at 3.) Plaintiff, as insurer to one of the named Underlying Defendants, either knew or should have known about this outcome of the UJC investigation and hearing because it occurred prior to the filing of the Underlying Complaint. While the UJC's findings were by no means determinative of or binding upon the results of the Underlying Lawsuit, they were at least indicative that substantiation of the "intentional hazing" allegations was not a foregone conclusion from the outset of the case.

The Court has already found that there is a possibility of coverage due to the Underlying Complaint alleging an occurrence, and it necessarily follows that accidental injury was alleged. Defendants rightly acknowledge that the intentional-acts exclusion could ultimately preclude the duty to indemnify (ECF No. 36 at 29), but at this stage the exclusion does not preclude the duty to defend.

In *Blanton*, Judge Harwell noted the South Carolina rule applicable to policy

exclusions for "expected or intended" injuries,[6] namely, "'that *not only the act causing the loss must have been intentional but . . . the results of the act must also have been intended.*'" 2015 WL 9239788 at *10 (quoting *Miller v. Fidelity–Phoenix Ins. Co.*, 231 S.E.2d 701, 702 (S.C. 1977)) (emphasis in original). The underlying plaintiff in *Blanton* had already won a jury award, including actual and punitive damages, on his claims for assault and negligence arising from being intentionally hit by the underlying defendant during an altercation on a golf course. *Id.* at *1, *11. Judge Harwell found that summary judgment for the insurer on the issue of the intentional-acts exclusion was precluded:

> The jury in the underlying case apparently did not find that [the underlying defendant] hit [the underlying plaintiff] in self defense. They found for [the underlying plaintiff] and awarded a sizable amount of damages. However, it is unclear whether [the underlying defendant] intended that the hit would cause the type of injury suffered by [the underlying plaintiff]. *Therefore, factual issues are present as to whether the bodily injury was expected or intended by the insured.*

*Id.* at *11 (emphasis added). The *Blanton* court further noted:

> Some insurance companies have revised their policies to exclude, not only injuries expected or intended by the insured, but also injuries resulting from intentional acts with expected *or unexpected* results. *See South Carolina Farm Bureau Mut. Ins. Co. v. Dawsey*, 371 S.C. 353, 638 S.E.2d 103 (2006); *Amica Mut. Ins. Co. v. Edwards*, No. 8:10–cv–1143–GRA, 2011 WL 2971935 (D.S.C. July 20, 2011). The policy now before the Court had apparently not been revised in this manner and used "expected or intended" injury as its language.

*Id.* at *10 (emphasis added). Defendants rightly note that the Policy exclusion at issue in the instant case does not contain language about "unexpected" results of intentional acts, but rather excludes injuries that were "intended by or which reasonably may be expected to result from" intentional or criminal acts. (*See* ECF No. 36 at 30.) The Court

---

[6] The exclusion at issue in *Blanton* stated that coverage did not apply to bodily injury or property damage "(1) which is either *expected or intended* by the insured; or (2) which is the result of willful and malicious acts of the insured." 2015 WL 9239788 at *4 (emphasis added).

acknowledges that the inclusion of language regarding bodily injury that is "of a different kind or degree than intended or reasonably expected" appears to be an attempt to prevent the exclusion from being interpreted in an overly narrow manner. However, it is not the same as policy language that excludes coverage for "unexpected" results.

In *Harvey*, the South Carolina Court of Appeals held that negligence claims were not precluded from coverage by an intentional-acts exclusion in the applicable policy, stating:

> The South Carolina Supreme Court has held that, for an act to be an intentional act excluded by the intentional act exclusion of a policy, 1) the act which produces the loss must be intentional, *and 2) the results of the act must be intended. Miller v. Fidelity–Phoenix Ins. Co.*, 231 S.E.2d 701 (S.C. 1977). Betsy Baker's complaint does not allege the Harveys' [sic] intended the harm to their grandchildren through their negligent supervision. Therefore, the Harveys' act of permitting the children to be in the company of potential abusers is not excluded by the intentional acts exclusion of the Harveys' policies.

498 S.E.2d at 229 (emphasis added). As already explained in the foregoing analysis regarding the definition of "accident" and Marcantonio's negligence claim, the Court is certainly not prepared to find as a matter of law that Ingraham *intended* for Marcantonio to suffer the harms he has alleged. *See Allstate v. Biggerstaff*, 703 F. Supp. 23 (D.S.C. 1989) (denying insurer's motion for summary judgment on the applicability of an intentional-acts exclusion, where the underlying plaintiff, a Citadel cadet, plead intentional torts of assault, trespass, and intentional infliction of emotional distress against a group of other cadets, because material issues of fact remained concerning the insured's state of mind at the time the acts complained of were committed). Thus, it is by no means axiomatic that the exclusion applies to the panoply of allegations in the Underlying Complaint. Stated another way, one possible outcome of the Underlying

Lawsuit was a final verdict against Ingraham for accidental injury from negligence. Under this possibility, the intentional/criminal-acts exclusion would not apply as a matter of law. Accordingly, Plaintiff has not met its burden of establishing that there is no genuine issue of material fact as to whether Marcantonio's injuries were the intended, or reasonably expected, result of Ingraham's intentional or criminal acts.

The cases cited by Plaintiff to support the application of the intentional-acts exclusion under the operative facts are inapposite. Plaintiff cites *Farmers Auto. Ins. Ass'n v. Long*, No. 1:13-CV-01236 AWI, 2014 WL 1665001 (E.D. Cal. Apr. 23, 2014), for the proposition that the court determined that an intentional-acts exclusion precluded coverage for an insured's acts of intentional hazing. (*See* ECF No. 24-1 at 19-20.) In that case, the named insureds' son engaged in a hazing ritual in which fraternity pledges were encouraged to drink alcohol, resulting in the death of one of the pledges. *Long*, 2014 WL 1665001 at *1-*2. *Long* is distinguishable from the instant case on both procedural and factual grounds. First, the order cited by Plaintiff consisted of a Magistrate Judge's recommendation that a default judgment be entered, and did not consider the summary judgment standard applicable here. *Id.* at *2-*3. Second, the underlying facts in *Long* involved hazing that consisted *solely* of encouraging the consumption of alcohol to the point where the victim passed out, whereupon the underlying defendants dragged the victim to a "Drunk Room," left him unattended for several hours, and later discovered him motionless, covered in his own vomit. *Id.* at *1-*2. By the terms of his own pleading, Marcantonio was not given alcohol and did not drink alcohol. Unlike the victim in *Long*, Marcantonio was not observed as having become "visibly incapacitated, exhibiting severe intoxication, including passing out and

falling out of his chair and onto the floor," nor was he "dragged" unresponsive to another room and left unmonitored. *See id.* Additionally, there is no indication that the underlying lawsuit included a negligence claim, and certainly no explanation of how such a claim might have been viable under the alleged facts. Simply put, *Long* has no application here.

Plaintiff also cites *S.C. Farm Bureau Mut. Ins. Co. v. Dawsey*, 638 S.E.2d 103 (S.C. Ct. App. 2006), as "instructive in providing guidance as to how a South Carolina court will apply a similar exclusion in this context." (ECF No. 24-1 at 20.) In *Dawsey*, during an altercation between a father and son, "[t]he father fired his pistol three times at the tires on the son's truck. One of the bullets ricocheted off the driveway and hit the son in the jaw, inflicting substantial injury. The son filed a negligence action against the father." 638 S.E.2d 103, 104. The exclusion in question prevented coverage for the "expected or unexpected results" of intentional acts committed by the insured. *Id.* The insurer brought a declaratory judgment action in which it was determined that the intentional-acts exclusion applied. *Id.* at 105. The express preclusion of coverage for "unexpected results" of intentional acts was essential to the *Dawsey* court's holding:

> The son argues the policy language in this case excludes coverage for *unexpected* consequences but does not exclude coverage for *unintentional* consequences. Thus, the son maintains, the second prong of the [*Miller v. Fidelity–Phoenix Ins. Co.*, 231 S.E.2d 701 (S.C. 1977)] test should still apply to provide coverage. The son admits, however, that the terms "intend" and "expect" are "often defined synonymously." To read the policy in the manner urged by the son would require us to rewrite the policy, rather than interpret it as written. . . . . We agree with the master that the policy excludes coverage for the son's injuries, which were unexpected consequences of the father's intentional act of shooting at the son's tire.

*Id.* (emphasis in original).

Defendants argue that *Dawsey* is distinguishable from the instant case on numerous grounds, so as to make it inapplicable here, and the Court agrees. First, the intentional-acts exclusion in the case *sub judice* does not include language regarding "unexpected results," and therefore does not alter the traditional rule requiring intent to harm, or expectation of harm, established in the *Miller* case and recently applied by Judge Harwell in *Blanton*. Second, the Underlying Complaint includes no allegations that Ingraham used an inherently dangerous weapon, as did the insured in *Dawsey*. Third, Plaintiff has not shown that there is no genuine issue of material fact as to whether Ingraham intended to harm Marcantonio, and has thus failed to carry its burden at the summary judgment stage. Fourth, the *Dawsey* case involved appellate review of a master in equity's findings regarding the intentional-acts exclusion, not summary judgment proceedings where the standard is much higher and where Plaintiff must show there is no possibility of coverage as a matter of law. (*See* ECF No. 36 at 33.)

In its reply, Plaintiff argues that the *Dawsey* court "specifically rejected the holdings of previous cases, including *Miller*" with regard to the application of intentional-acts exclusions. (*See* ECF No. 42 at 9.) The Court disagrees. The *Dawsey* court merely distinguished the import of an intentional-acts exclusion that contains language regarding "unexpected results" from the policies at issue in *Miller* and *Vermont Mutual Insurance Co. v. Singleton*, 446 S.E.2d 417 (S.C. 1994), which "did not specifically exclude coverage for the unintentional consequences of intentional acts." *Dawsey*, 638 S.E.2d at 105. The Court finds that *Dawsey* differs from the instant case in the language of the exclusion at issue, in the rigor of the standard applied to the insurer's attempt to

invoke the exclusion, and in the underlying factual context. Accordingly, Plaintiff's reliance on that case is unavailing, and its motion for summary judgment is denied.

### (d) The Duty to Defend and the Potential Duty to Indemnify

Applying South Carolina insurance law, the Fourth Circuit Court of Appeals has explained: "[W]hile the duty to defend is based on the allegations in the complaint, *see* [*R. A. Earnhardt Textile Mach. Div., Inc. v. S.C. Ins. Co.*, 282 S.E.2d 856, 857 (S.C. 1981)], the duty to indemnify is based on evidence found by the factfinder, *see* [*Jourdan v. Boggs/Vaughn Contracting, Inc.*, 476 S.E.2d 708, 711 (S.C. 1996)]." *Ellett Bros. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001). The duty to defend is broader than the duty to indemnify, and the duty to defend arises whenever a claim potentially implicates the duty to indemnify. *See Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 809 F. Supp. 2d 449, 457 (D.S.C. 2011); *Auto-Owners Ins. Co. v. Newsome*, No. 4:12-CV-00447-RBH, 2013 WL 3148334, at *4 (D.S.C. June 19, 2013). "South Carolina law requires that a triggered insurer with a duty to defend the policyholder in a suit must defend the policyholder against all claims in that suit, even those claims that are not covered under the policy." *Cincinnati Ins. Co. v. Crossmann Communities of N. Carolina, Inc.*, No. 4:09-CV-1379-RBH, 2013 WL 1282017, at *11 (D.S.C. Mar. 27, 2013).

The Court has explained at length, *supra*, that there is a potential duty to indemnify in this case. However, there have been no factual findings and the Underlying Lawsuit is now settled pursuant to a confidential agreement. Accordingly, Plaintiff's motion for summary judgment is denied, and Defendants' motion for partial summary judgment is granted. Allstate has/had a duty to defend Ingraham, but its duty to

indemnify will potentially remain an issue for ongoing litigation.

## II. Motion to Compel

### (a) Legal Standard

Parties to civil litigation may obtain discovery regarding "any non-privileged matter that is relevant to any party's claim or defense," including any information that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Courts are to construe broadly rules enabling discovery. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980, 983 (4th Cir. 1992) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

However, while the parties' ability to obtain information through civil discovery is broad, it is not without limits. *See*, *e.g.*, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) ("[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries."). "The scope and conduct of discovery are within the sound discretion of the district court." *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 568 n.16 (4th Cir. 1995) (citing *Erdmann v. Preferred Research, Inc. of Ga.*, 852 F.2d 788, 792 (4th Cir. 1988)); *see also Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 402 (4th Cir. 2003) ("Courts have broad discretion in [their] resolution of discovery problems arising in cases before [them]." (alterations in original and internal quotation marks omitted)).

### (b) The Documents and Information Sought

In their motion to compel, Defendants seek an order from the Court compelling Plaintiff to produce documents and information concerning any decision by a court or arbitrator, or by Allstate itself, that Allstate had a duty to defend or indemnify in a lawsuit

or claim involving allegations of hazing. (ECF No. 28 at 3-4.) Plaintiff responds with a series of objections to production of the documents and information requested, stating: (1) information related to other arbitration or court decisions involving Allstate insureds and the interpretation of Allstate policy language involving hazing claims in other cases is not relevant to the issues before *this* Court; (2) even if the information sought is relevant, it is equally available to Defendants; (3) it would be unduly burdensome for Allstate to locate the requested information because a database or record of such information is not maintained; (4) Defendants' requests are overly broad in that they request information related to cases and claims in other jurisdictions outside South Carolina. (ECF No. 41 at 2-3.)

The motion to compel was filed when the parties were still briefing their cross-motions for summary judgment and, as a result, both Defendants' and Plaintiff's arguments center almost exclusively upon the relevance of the requested evidence in establishing whether Allstate has a duty to defend the Underlying Lawsuit. (*See id.* at 4-6; ECF No. 41.)[7] The duty to defend has now been established in this order, and the reasons given by the parties both for and against production of the information sought appear to be largely moot. This is not to say that the information sought would not be relevant to the question of Allstate's potential duty to indemnify. At the current juncture, the motion to compel is denied, without prejudice and with leave to refile should the parties continue to litigate the indemnification issue.

---

[7] Defendants make arguments to the following effect, "The documents and information sought by the Ingrahams is highly relevant to whether or not the policy language could reasonably be construed to *require Allstate to defend* an action when hazing is alleged." (ECF No. 28 at 5-6 (emphasis added).) Plaintiff responds in like manner, "The information related to other arbitration or court decisions involving Allstate insureds and the interpretation of Allstate policy language involving hazing in other cases is not relevant to the issue before this court – whether the allegations as stated in the Underlying Complaint state an occurrence requiring Allstate to *provide Ingraham a defense*." (ECF No. 41 at 2 (emphasis added).)

## CONCLUSION

After careful consideration of the parties' briefs, the associated record, and the applicable law, the Court hereby DENIES Plaintiff's motion for summary judgment (ECF No. 24), GRANTS Defendants' motion for partial summary judgment on the duty to defend (ECF No. 25), and DENIES Defendants' motion to compel without prejudice and with leave to refile (ECF No. 28).

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 14, 2017
Greenville, South Carolina